Lee BERNSTEIN, Appellant–Plaintiff,

v.

Daniel W. GLAVIN and Beckman, Kelly & Smith, Appellees–Defendants.

No. 45A03–9810–CV–445.

Court of Appeals of Indiana.

March 15, 2000.

Ralph E. Dowling, Wilson Kehoe & Winningham, Indianapolis, Indiana, Attorney for Appellant.

David C. Jensen, Michael E. O'Neill, John P. Twohy, Eichhorn & Eichhorn, Hammond, Indiana, Attorneys for Appellees.

Michael P. McCready, Law Offices of Michael. P. McCready, P.C., Chicago, Illinois, Attorney for Amicus Curiae The National Writers Union (UAW LOCAL 1981).

## OPINION

BROOK, Judge

### Case Summary

Appellant-plaintiff Lee Bernstein ("Bernstein") appeals the trial court's denial of her motion for summary judgment on her claim of legal malpractice and its grant of the cross-motion for summary judgment made by appellees-defendants Daniel W. Glavin ("Glavin") and Beckman, Kelly & Smith ("BKS") (collectively, "appellees").

We affirm.

### Issues

One issue is dispositive of our review: whether the trial court erred in granting appellees' motion for summary judgment.

### Facts and Procedural History [1]

The facts most favorable to Bernstein indicate that in the November/December 1981 issue of "Totline" newsletter, editor Jean Warren ("Warren") of Warren Publishing solicited submissions of original songs that could be sung to the tune of familiar children's songs. Warren informed her readers that these songs would eventually be compiled into a book, with the author of each song to receive a complimentary copy of the songbook plus acknowledgement for her work. In 1982, Bernstein wrote the lyrics to a song entitled "I Love You" that were intended to be sung to the tune of the well-known children's song "This Old Man." [2] After submitting the "I Love You" lyrics to Warren Publishing, Bernstein received the following form:

Dear Totline Music Contributor,

The Totline compiled songbook will be printed and released by the end of March. As indicated earlier, in payment for the rights to your lyrics, Warren Publishing agrees to send you a complimentary copy of the songbook.

If you have contributed more than one song, you may receive additional songbooks or $5 per additional song, whichever you prefer.

Even though your lyrics will become the property of Warren Publishing, they will always appear with your name as author.

Please sign the bottom of this form indicating you understand the terms of our agreement. If you have contributed more than one song, please indicate which form of payment you prefer.

Please return this form as soon as possible so that your songs may be included in the songbook.

Sincerely,

/s/ Jean Warren

Editor, Totline

Bernstein signed the form on January 2, 1983, and returned it to Warren Publishing. Thereafter, she received a copy of the songbook entitled "Piggyback Songs." The following information appeared on the

---

1. We heard oral argument in this case on February 21, 2000, in Indianapolis. We commend both parties for their excellent preparation and oral presentations.

2. The lyrics of "I Love You" are as follows: "I love you, you love me; We're as happy as can be! Here's a great big kiss and a hug from me to you. Won't you say you love me, too?"

songbook's copyright page: "Copyright © 1983 Jean Warren All rights reserved, except for the inclusion of brief quotations in a review, no part of this book may be reproduced in any form without the written permission of the publisher." "I Love You" appeared on page eighteen of the songbook, with Bernstein receiving credit as the lyricist. On March 15, 1988, Warren registered her copyright as the "owner of exclusive right(s)" in "Piggyback Songs" with the United States Copyright Office, describing the songbook as a "[c]ompilation and selections of text."

In approximately 1988, Lyons Entertainment Group, Inc. ("Lyons"), located in Dallas, Texas, began producing a series of television programs entitled "Barney and Friends" and videocassettes entitled "Barney and the Backyard Gang," which featured a six-foot purple and green dinosaur named Barney. After one of Barney's producers heard "I Love You" performed at a children's recreational class, Lyons incorporated the song into each television program and videocassette.[3] "Barney and Friends" was first broadcast on the Public Broadcasting System ("PBS") in 1992.

When Bernstein heard "I Love You" performed on a PBS episode of "Barney and Friends" in 1992, she sought the advice of Glavin, a partner in the law firm of BKS. Bernstein informed Glavin that Warren Publishing had published the lyrics in 1983 and that she had received only the songbook as compensation. When Glavin asked whether she had signed anything to transfer the rights to the lyrics to Warren Publishing, Bernstein could not specifically recall. Glavin informed her that she was entitled to all rights in the lyrics if she had written them and had not transferred any of her rights therein.

In a letter dated July 29, 1992, Glavin informed Lyons of its unauthorized use of Bernstein's lyrics and enclosed photocopies of the cover, the copyright page, and page eighteen of "Piggyback Songs." Shortly thereafter, Lyons and Glavin entered into several weeks of negotiations over rights, compensation, and credit with respect to the past and future use of Bernstein's lyrics.

In September 1992, Bernstein signed an agreement with Lyons in which she transferred to Lyons "all right, title and interest in and to ["I Love You"], together with all copyrights, renewals and extensions thereof." In consideration for the transfer, Bernstein received $5,000 for Lyons' past use of the lyrics, plus $2,500 "in connection with all uses" of the song through August 31, 1996. For future use of the lyrics, she agreed to receive $2,500 to be paid on September 1, 1996, and every two years thereafter, with future payments to be adjusted for inflation. Lyons agreed that Bernstein would be entitled to public performance royalties as author of the lyrics and would receive credit as the lyricist "in connection with all subsequent uses of the [song] or sheet music, recordings, audio-visual works and television broadcasts[.]" Bernstein further "warrant[ed] and represent[ed] that [she] ha[d] the full right, power, and authority to enter into [the] Agreement and to grant and vest in [Lyons] all rights set forth [t]herein, free and clear of any and all claims, rights and obligations whatsoever and that [she][was] not aware of any copyright in another person which shall violate or infringe the copyright of any third party."

Shortly after Bernstein signed the agreement, Lyons began to aggressively promote its Barney videotapes and other products, and by the end of 1992, Barney had become, in appellees' words, "a merchandising bonanza." Dissatisfied with the compensation and credit arrangements Glavin had negotiated with Lyons, Bernstein sought different counsel. On February 5, 1993, Glavin received a letter from an attorney representing Warren Publishing who advised him that Bernstein had assigned the rights to the "I Love You" lyrics to Warren Publishing in 1983; en-

---

**3.** The lyrics sung by Barney differ slightly from Bernstein's original version.

closed with the letter was a copy of the form that Bernstein had signed on January 2, 1983. Glavin forwarded a copy of the letter and the form to Bernstein's new attorneys and Lyons.

On February 12, 1993, Bernstein's new counsel wrote to Warren Publishing and Lyons to contest the validity of Bernstein's transfers of the rights to the "I Love You" lyrics to both entities. On February 19, 1993, Lyons registered Bernstein's transfer of the copyright in "I Love You" with the United States Copyright Office. In May 1993, Warren amended her copyright registration to reflect ownership of the copyright in the lyrics of "I Love You" and other songs in "Piggyback Songs" in particular, not just in the compilation as a whole.

Lyons filed a declaratory judgment action against Bernstein in a federal district court in Texas on April 16, 1993, seeking enforcement of their September 1992 agreement. Warren Publishing filed suit against Lyons and Bernstein in a federal district court in Washington on May 27, 1993, seeking enforcement of its copyright in "I Love You." Following mediation, these lawsuits were eventually settled and dismissed.

On August 24, 1994, Bernstein filed a legal malpractice action against appellees, alleging that they had "failed to properly investigate her rights and potential liabilities under the copyright laws or evaluate the potential value of her claim for past copyright infringement or the value of a transfer of her rights in the lyrics." On July 11, 1997, both parties filed motions for summary judgment. On September 14, 1998, the trial court granted appellees' motion for summary judgment and denied Bernstein's motion in relevant part as follows:

> Based on the evidentiary materials designated to this Court by the respective parties, the Court finds that the January, 1983, Transfer Agreement executed by the plaintiff in favor of Warren Publishing House, constituted an effective assignment under applicable law of the copyright of the song's lyrics. This transfer divested the plaintiff of any rights in the lyrics of the song which is the subject matter of this litigation....
>
> As a result of the plaintiff's effective transfer of the copyright of the subject lyrics, the plaintiff could not, as a matter of law, sustain any damages from any malpractice allegedly committed by the defendants because she had no proprietary rights in them.

## Discussion and Decision

### Summary Judgment—Standard of Review

We apply the same well-settled standard as the trial court when reviewing its grant or denial of summary judgment: whether a genuine issue of material fact exists and whether the moving party is entitled to judgment as a matter of law. *Golitko v. Indiana Dept. of Correction*, 712 N.E.2d 13, 15 (Ind.Ct.App.1999), *trans. denied.* "The trial court's grant of summary judgment is clothed with a presumption of validity and the appellant bears the burden of proving that the trial court erred." *Bamberger & Feibleman v. Indianapolis Power & Light Co.*, 665 N.E.2d 933, 936 (Ind.Ct.App.1996). We resolve any doubt as to a fact, or an inference to be drawn therefrom, in favor of the non-moving party. *Id.*

"Cross-motions for summary judgment do not alter our standard of review; rather, our inquiry remains whether a genuine issue of material fact exists which requires a trial on the merits." *Bamberger & Feibleman*, 665 N.E.2d at 936. "Specific findings and conclusions are not required in the summary judgment context, and although they offer valuable insight into the trial court's rationale for its judgment and facilitate our review, they are not binding on this court." *Golitko*, 712 N.E.2d at 15. "We will affirm a trial court's grant of summary judgment if it is sustainable on any theory found in the evidence designat-

ed to the trial court." *Bamberger & Feibleman,* 665 N.E.2d at 936.

## I. Copyright and Contract

 Our inquiry now focuses on the agreement that Bernstein signed in January 1983 and the trial court's determination that it "constituted an effective assignment under applicable law of the copyright of [the lyrics to "I Love You"]." "Generally, construction of a written contract is a question of law for which summary judgment is particularly appropriate." *Orem v. Ivy Tech State College,* 711 N.E.2d 864, 870 (Ind.Ct.App.1999), *trans. denied* (2000). Whether a contract is ambiguous is also a question of law for the court. *See Western Ohio Pizza, Inc. v. Clark Oil & Refining Corp.,* 704 N.E.2d 1086, 1091 (Ind.Ct.App.1999), *trans. denied.* "[A] contract is not ambiguous because a controversy exists where each party favors a different interpretation"; rather, "ambiguity results only when a contract is susceptible to more than one interpretation and reasonably intelligent [persons] would differ as to its meaning." *Commercial Union Ins. v. Moore,* 663 N.E.2d 179, 181 (Ind.Ct.App.1996), *trans. denied.* Absent ambiguity, we will give the terms of a contract their plain and ordinary meaning. *Orem,* 711 N.E.2d at 870. "This court will not construe clear and unambiguous provisions, nor will we add provisions not agreed upon by the parties." *Western Ohio Pizza,* 704 N.E.2d at 1091. "In interpreting an unambiguous contract, we give effect to the parties' intentions as expressed in the four corners of the instrument." *Hyperbaric Oxygen Therapy Systems, Inc. v. St. Joseph Medical Center of Ft. Wayne, Inc.,* 683 N.E.2d 243, 247 (Ind. Ct.App.1997), *trans. denied.*

As a preliminary consideration, we note that copyright in a work vests initially in the author of the work. *See* 17 U.S.C. § 201(a) (1994).

Copyright in each separate contribution to a collective work is distinct from copyright in the collective work as a whole, and vests initially in the author of the contribution. In the absence of an express transfer of the copyright or of any rights under it, the owner of copyright in the collective work is presumed to have acquired only the privilege of reproducing and distributing the contribution as part of that particular collective work, any revision of that collective work, and any later collective work in the same series.

17 U.S.C. § 201(c) (1994). Under 17 U.S.C. § 201(d) (1994), "[t]he ownership of a copyright may be transferred in whole or in part by any means of conveyance or by operation of law." "Ownership of the relevant copyright . . . is a matter to be determined from the parties' contract." *Barris Industries, Inc. v. Worldvision Enterprises, Inc.,* 875 F.2d 1446, 1449 (9th Cir.1989).

"A transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent." 17 U.S.C. § 204(a) (1994). Bernstein contends that the trial court erred when it determined as a matter of law that the agreement she entered into with Warren Publishing transferred her copyright in the lyrics to "I Love You." Because the agreement neither mentions the term "copyright" nor specifies the rights [4] that she intended to transfer, she argues that it is ambiguous and cannot be construed as a matter of law to transfer ownership of the lyrics' copyright to Warren. We cannot agree.

---

**4.** 17 U.S.C. § 106 (1994) gives the owner of a copyright "the exclusive rights to do and to authorize any of the following": (1) to reproduce the copyrighted work in copies; (2) to prepare derivative works based on the copyrighted work; (3) to distribute copies of the copyrighted work; (4) to publicly perform the copyrighted work; and (5) to publicly display the copyrighted work.

■ It is well settled that "[n]o magic words must be included in a document to satisfy [the requirements of 17 U.S.C.] § 204(a). Rather, the parties' intent as evidenced by the writing must demonstrate a transfer of the copyright." *Radio Television Espanola S.A. v. New World Entertainment, Ltd.*, 183 F.3d 922, 927 (9th Cir.1999). As Judge Kozinski commented in *Effects Associates, Inc. v. Cohen,* 908 F.2d 555, 557 (9th Cir.1990), *cert. denied, Danforth v. Cohen,* 498 U.S. 1103, 111 S.Ct. 1003, 112 L.Ed.2d 1086 (1991),

> Section 204's writing requirement is not unduly burdensome; it necessitates neither protracted negotiations nor substantial expense. The rule is really quite simple: If the copyright holder agrees to transfer ownership to another party, that party must get the copyright holder to sign a piece of paper saying so. It doesn't have to be the Magna Charta; a one-line pro forma statement will do.

Our review of the contested agreement establishes that it clearly and unquestionably transferred Bernstein's rights in the lyrics to Warren Publishing in exchange for a complimentary copy of "Piggyback Songs" and perpetual credit as the lyricist of "I Love You."

In *Shugrue v. Continental Airlines, Inc.*, 977 F.Supp. 280, 285–86 (S.D.N.Y. 1997), on which appellees rely, the court examined a stock agreement that transferred "all right, title and interest . . . in and to all programs and software" and concluded that the agreement contained no ambiguity:

> The only reasonable interpretation of the pertinent language of the [stock agreement] is that the parties intended the transfer of all rights, including copyrights, to all of Eastern's programs and software . . . .
>
> The language of the [stock agreement] is clear and unambiguous. Eastern transferred "all right, title and interest" to "[a]ll of [its] computer programs and software." No exception was carved out for copyrights; no rights, titles or inter-

ests were retained; and the transfer was not just of a "license." . . .

Eastern's proposed interpretation of the [stock agreement] would require that [the contested provision] be rewritten to include language to the effect that Eastern was transferring only a license or that Eastern was retaining the copyrights. No such language exists.

Eastern's proposed interpretation simply does not make sense. Computer programs and software are not like paintings or other tangible objects. In a non-consumer setting such as this, a transfer of "all right, title and interest" to computer programs and software can only mean the transfer of the copyrights as well as the actual computer program or disks. If the parties to such a transaction intend to transfer just a license to use the program, with the transferor retaining the copyrights, the parties surely would spell that out.

Although the agreement in the instant case does not contain the language "all right, title and interest," neither did it reserve Bernstein any rights in the lyrics, nor did it restrict or limit any of Warren's rights therein. As appellees correctly observe, lyrics are "merely words" that can be "possessed and disposed of as property only via the copyright to the lyrics" (or via any of the exclusive rights listed in 17 U.S.C. § 106). *Cf. Playboy Enterprises, Inc. v. Dumas,* 53 F.3d 549 (2nd Cir.1995), *cert. denied, Dumas v. Playboy Enterprises, Inc.,* 516 U.S. 1010, 116 S.Ct. 567, 133 L.Ed.2d 491 (1995) (holding that legend on backs of checks purporting to assign appellant "all rights, title and interest in and to" appellee's paintings did not transfer copyright therein); *see* 17 U.S.C. § 202 (1994):

> Ownership of a copyright, or of any of the exclusive rights under a copyright, is distinct from ownership of any material object in which the work is embodied. Transfer of ownership of any material object . . . does not of itself convey any rights in the copyrighted work embodied

in the object; nor, in the absence of an agreement, does transfer of ownership of a copyright or of any exclusive rights under a copyright convey property rights in any material object.

■ Bernstein examines the phrase "[e]ven though your lyrics will become the property of Warren Publishing" in isolation and asserts that it is insufficient to transfer copyright ownership and does not indicate a present intent to transfer. However, we determine the parties' intentions by considering the contract as a whole and not by reading particular words and phrases in isolation. *See Grand Trunk Western R. Co. v. Kapitan,* 698 N.E.2d 363, 367 (Ind.Ct.App.1998), *trans. denied* (1999). We agree with appellees that "considering the intangible nature of lyrics, there can be no confusion between ownership of the copyright in the lyrics and ownership of a material object"; thus, the term "property" in this instance can only refer to copyright, rather than the manuscript on which Bernstein wrote the lyrics. *See Shugrue,* 977 F.Supp. at 286 (discussing intangible nature of computer programs and software). With respect to the present transfer argument, the phrase "will become" unambiguously indicates that the lyrics would not become the property of Warren Publishing unless and until Bernstein accepted the terms of the agreement.

■ Bernstein's contention that she transferred only a non-exclusive license in the lyrics is equally unavailing. Her receipt of a single complimentary songbook as consideration is certainly not dispositive; indeed, it is improper for courts to inquire into the adequacy of consideration. *See Tanton v. Grochow,* 707 N.E.2d 1010, 1012 (Ind.Ct.App.1999). Furthermore, the designated evidence reflects that as an aspiring writer, Bernstein was interested in seeing both her work and her name in print; the agreement's provision that "I Love You" would "always appear with [her] name as author" is evidence of valuable consideration and of both Warren's intent to obtain and Bernstein's intent to transfer more than one-time publishing rights in the lyrics. Bernstein's argument that we should inspect the terms of the agreement through the distorted lens of hindsight is unsupported by either logic or persuasive legal authority.

■ Next, Bernstein challenges the validity of Warren's registration of the copyright transfer. Because Warren registered "Piggyback Songs" in 1988 as a "compilation and selection of text" and failed to identify the transfer of copyright from the individual lyricists, Bernstein asserts that the registration should be viewed as an admission of knowledge that Warren "did not hold nor intend to transfer" all rights to "I Love You" and the lyrics to the other songs in the songbook. As previously noted, transfer of copyright ownership is not valid unless the transfer is reduced to writing and signed by the owner of the rights conveyed. 17 U.S.C. § 204(a). Having established that the agreement signed by Bernstein was a valid transfer of the copyright, we turn to 17 U.S.C. § 205(a) (1994) regarding the recordation of transfers:

> **Conditions for recordation.** Any transfer of copyright ownership or other document pertaining to a copyright may be recorded in the Copyright Office if the document filed for recordation bears the actual signature of the person who executed it, or if it is accompanied by a sworn or official certification that it is a true copy of the original, signed document.

Warren signed the copyright registration form and certified that she was the owner of the "exclusive right(s) ... of all work identified in this application." Bernstein offers no authority to support her assertion that Warren's registration "did not extend to the individual lyrics contained in the book."

Because Bernstein's transfer of the copyright was effective upon her signing of the written agreement and was not de-

pendent upon Warren's registration of the transfer, we need not address this argument further. Likewise, we need not address her arguments regarding the conflicting priorities between Lyons and Warren as competing registrants of Bernstein's successive copyright transfers. As mentioned above, Glavin provided Lyons with *actual* notice of Warren's ownership of the copyright in the "I Love You" lyrics when he mailed photocopies of the relevant pages of the songbook in July 1992. *Cf.* 17 U.S.C. § 205(c) and (d) (1994) (regarding *constructive* notice of copyright transfer). Both Lyons and Warren have had their respective days in federal court on this issue, and it has nothing whatever to do with Glavin's representation of Bernstein, to which we now direct our attention.

## II. Legal Malpractice

Having established that Bernstein transferred her copyright in the lyrics to Warren in 1983 – over nine years before she first contacted Glavin – we agree with the trial court that she could not sustain damages from any alleged malpractice as a matter of law. To prove a legal malpractice claim, "a plaintiff-client must show (1) employment of an attorney (duty); (2) failure by the attorney to exercise ordinary skill and knowledge (breach); (3) proximate cause (causation); and (4) loss to the plaintiff (damages)." *Fricke v. Gray,* 705 N.E.2d 1027, 1033 (Ind.Ct.App. 1999), *trans. denied.* A defendant is entitled to judgment as a matter of law "when undisputed material facts negate at least one element of a plaintiff's claim." *McDaniel v. Business Inv. Group, Ltd.,* 709 N.E.2d 17, 20 (Ind. Ct.App.1999), *trans. denied.* Because Bernstein had no copyright in the lyrics to transfer to Lyons, she cannot establish that she was damaged by Glavin's handling of the negotiations. Bernstein is not entitled to recover for Glavin's failure to obtain what she considers to be adequate compensation for rights she willfully forfeited years ago. The judgment of the trial court is affirmed.

Affirmed.

NAJAM, J., and ROBB, J., concur.